UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ELIZABETH VALENTIN,                              :

                                                 :

                    Plaintiff,                   :        OPINION AND ORDER

                                                 :
        -v.-                                               16 Civ. 2956 (GWG)
                                                 :
NANCY A. BERRYHILL,                              :

                                                 :

                    Defendant.[1]                :
-------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

        Plaintiff Elizabeth Valentin brings this action seeking review of the final decision of the

Acting Commissioner of Social Security ("Commissioner"), who found that Valentin was not

disabled before December 29, 2013, and is thus ineligible for Social Security Disability ("SSD")

or Supplemental Security Income ("SSI") payments before that date.  Both parties have moved

for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).[2]  For the

reasons stated below, Valentin's motion is granted and the Commissioner's motion is denied.

---

        [1]  Nancy A. Berryhill is substituted for Carolyn W. Colvin as the defendant in this suit
pursuant to Federal Rule of Civil Procedure 25(d).

        [2]  See Motion for Judgment on the Pleadings, filed Aug. 11, 2016 (Docket # 15);
Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, filed Aug.
11, 2016 (Docket # 16) ("Pl. Mem."); Notice of Motion, filed Sept. 1, 2016 (Docket # 17);
Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings and in
Opposition to Plaintiff's Motion for Judgment on the Pleadings, filed Sept. 1, 2016 (Docket
# 18) ("Comm'r Mem."); Reply Memorandum in Further Support of Plaintiff's Motion for
Judgment on the Pleadings, filed Sept. 15, 2016 (Docket # 19); Reply Memorandum of Law in
Further Support of Defendant's Motion for Judgment on the Pleadings, filed Sept. 28, 2016
(Docket # 20).

I. BACKGROUND

    A. Valentin's Claim for Benefits and Procedural History

Valentin filed her application for SSD and SSI on December 6, 2010. See Certified Administrative Record, filed July 8, 2016 (Docket # 10) ("R."), 220-36. Her application was initially denied on March 4, 2011. R. 121-28. She requested a hearing before an Administrative Law Judge ("ALJ") and retained counsel on March 16, 2011. R. 132-33. An ALJ conducted a hearing on December 8, 2011. R. 48-63. In a decision dated January 30, 2012, the ALJ found that Valentin was not disabled. R. 97-114.

Valentin requested review of the ALJ's decision by the Appeals Council. R. 172-73. The Appeals Council granted review and remanded the claim on March 12, 2013, instructing the ALJ to consult a vocational expert and further evaluate Valentin's physical and mental impairments. R. 115-20. The ALJ held a second hearing on March 11, 2014. R. 64-94. On April 9, 2014, the ALJ issued a partially favorable decision finding Valentin disabled as of December 23, 2013, but not before that date. R. 19-47. Valentin requested review by the Appeals Council for the portion denying her benefits prior to December 29, 2013. R. 16. On February 24, 2016, the Appeals Council denied her request for review. R. 1-6.

On April 21, 2016, Valentin filed this lawsuit seeking review of the Commissioner's decision. See Civil Complaint, filed Apr. 21, 2016 (Docket # 1).

    B. Summary of Testimony at the Two Hearings

Valentin testified that she had last worked as a teacher's aide, and before that had assisted at a nursing home. R. 53, 81. On the date she asserted her disability began, May 18, 2009, she was fired from her job because she was "under investigation" for a "personal issue." R. 55; see also R. 220, 414, 1003, 1185. She became unable to work also due to pain in her

joints, shoulder, knees, back, ankles, and neck. R. 54, 56-57, 76-77. She is unable to sit, stand, or walk for long periods, and must alternate between sitting and standing. R. 54, 57, 76. She can only carry light weight, no more than a gallon of milk, with her left arm, and has trouble with repeated use of her right arm. R. 74-76. She struggles to perform household chores, relying on her two adult children to help her cook, clean, and do grocery shopping. R. 58-59, 79. Valentin also testified that she is depressed. R. 77-78. She has anxiety, feels "scared all the time," and is "always flipping out" in stressful situations, such as when waiting for a doctor's appointment. See R. 61. She is lonely, but did not socialize with friends or belong to any social or church groups. R. 61-62. Her medications affect her ability to think straight, and make her forgetful. R. 68-69.

At the March 11, 2014, hearing, the ALJ took testimony from a vocational expert and asked her to consider a hypothetical person, age 45, who had completed high school, was limited to sedentary work with only occasional (meaning up to one-third of the day) use of the person's left, non-dominant hand, and who could perform simple work with occasional contact with others. R. 86-87. The vocational expert testified that at least three jobs existed in the regional and national economy that such a hypothetical person could perform: charge-account clerk, call-out operator, and ticket-checker. R. 87-88. The vocational expert testified that the ticket-checker position required "no real interpersonal contact." R. 88.

C. Medical Records

1. Pre-disability Treatment

Valentin was born on December 30, 1963, R. 95, and completed the 12th grade, R. 312. Prior to Valentin's alleged disability onset date in May 2009, she had two major surgeries. A lumbar spine MRI from July 21, 2005, showed a herniated disc, hydration lost, and a pinching of

the L5 nerve roots in Valentin's spine.  R. 576-78.  At the time, Valentin tried physical therapy,

Flexeril, Naproxen, and Motrin for treatment.  Id.  Dr. Jose A. Torres-Gluck, a neurologist at

Metropolitan Hospital Center in Manhattan ("Metropolitan"), performed a lumbar fusion to

repair the disc on December 8, 2005.  R. 653-58.  After the surgery, Valentin continued to work

as a rehabilitation counselor.  See R. 293, 345.  At a follow-up examination on May 1, 2007, Dr.

Torres-Gluck reported that she "[f]eels great.  Has no back or radicular symptoms.  [Is a]ble to

do heavy [physical] labor with minimal or no problems."  R. 633.

Valentin also complained of left knee and left shoulder pain in 2008.  See R. 494-501.

X-rays and MRIs of her shoulder showed degenerative changes to her acromioclavicular ("AC")

joint and a subscapularis bursal effusion,[3] but no fracture.  R. 499, 501.  An MRI of her left knee

revealed a medial meniscus tear.  R. 497.  Dr. Tyler S. Lucas, an orthopedic surgeon at

Metropolitan, performed arthroscopic surgery on her left shoulder on November 17, 2008, with a

postoperative diagnosis of left shoulder impingement syndrome and AC joint arthritis.  R. 502-

04.  He reported, on November 24, that she was able to move her shoulder well and could start

physical therapy.  R. 627.

In October 2008, Valentin complained of neck pain.  R. 630.  Dr. Torres-Gluck identified

muscular spasms as a likely cause, and prescribed Naprosyn, Flexeril, and physical therapy.  Id.

An appointment with Dr. Lucas in February 2009 revealed continuing pain at Valentin's left AC

joint, but with full motion and full strength in the shoulder.  R. 622.  Valentin also complained of

---

[3] A "subscapularis bursal effusion" refers to fluid leaking out of the sac under the
shoulder blade.  See Subtendinous b. of Subscapularis, Steadman's Medical Dictionary 261
(27th ed. 2000) ("[Bursa] between the tendon of the subscapularis muscle and the neck of the
scapula; it communicates with the shoulder joint."); Effusion, id. at 570 ("The escape of fluid
from the blood vessels or lymphatics into the tissues or a cavity.").

pain to her neck near the C4-C5 vertebrae and pain in her left knee.  Id.  Comments from Dr. Joji

Sakuma at Metropolitan reference an x-ray from October 2008 that revealed degenerative joint

disease, a reverse of the curvature of her spine, and muscle spasms.  R. 619.  Valentin continued

to work until May 2009.  See R. 54-55, 319, 345.

> 2.  Dr. Lucas

Dr. Lucas continued to treat Valentin after May 2009 for knee pain and shoulder pain.

See, e.g., R. 447-48, 458, 634, 670, 793, 1122, 1160, 1169.  An injection of Dexamethasone to

the AC joint, see R. 460, improved the pain, but only to a six on a ten-point scale, see R. 458.  X-

rays of her left shoulder in May 2009 revealed no fracture, but a possible dislocation of the AC

joint and positive indications of arthritis.  R. 380.  Dr. Lucas also performed arthroscopic surgery

on Valentin's left knee on November 4, 2009.  R. 506-07.  On May 17, 2010, Dr. Lucas noted

that Valentin's hips and knee had full range of motion, that she had tightness in her quads and

hamstring, and that her shoulder had full range of motion with pain to palpation at her left neck

and left AC joint.  R. 447.  He noted that her left shoulder and left knee had reached maximal

improvement, although it was also reported that she had 4/5 strength in her shoulder and

"chronic swelling and pain" in her left knee.  Id.

On May 17, 2010, Dr. Lucas reported to the New York State Worker's Compensation

Board that Valentin had a permanent impairment of her left knee and shoulder due to persistent

swelling and pain.  R. 513-15.  He indicated limitations in climbing stairs or ladders, kneeling,

lifting, or operating heavy equipment, but did not indicate any limitations in sitting, standing,

using public transit, using her upper extremities, or bending or twisting.  R. 515.

On June 16, 2011, Valentin complained to Dr. Lucas about pain to her left shoulder AC

joint.  R. 634.  She was also diagnosed with fibromyalgia around that date.  Id.  A new MRI of

the shoulder revealed no rotator cuff tear and flat acromion, with the shoulder at full motion and full strength.  See id.  Her left knee also showed pain to the lateral joint line, but negative McMurray test[4] and no pain or laxity to varus or valgus strain.  Id.  Nevertheless, Dr. Lucas declared her "disabled due to multiple chronic regional pain syndromes."  Id.

Dr. Lucas repeated these diagnoses in Medical Impairment Questionnaires ("MIQs") on September 28, 2011, and October 2, 2013, but his view of her limitations changed from the May 17, 2010, report to the Worker's Compensation Board.  R. 759-67, 907-14.  The MIQs, which are substantially the same, opine that Valentin had fibromyalgia, degenerative joint disease in her spine, spinal stenosis, and chronic fatigue syndrome, based on x-rays and MRIs of her neck and back.  R. 760, 907.[5]  Dr. Lucas noted that Valentin had pain in her left shoulder, knees, ankles, "jaw & teeth," neck, and upper and lower back.  R. 761, 908.  He stated that she could not sit or stand more than one hour in an eight hour work day and would need to change position every half-hour.  R. 762, 909.  He noted that she could frequently lift and carry up to five pounds and could occasionally lift and carry up to 10 pounds, but that pain to her shoulder and neck significantly limited her ability to repeatedly reach, handle, finger, or lift.  R. 763, 910.  He said that she had marked limitations with grasping, turning, and twisting objects; moderate limits in using her fingers and hands for fine manipulations; and marked difficulty using her arms for reaching, including overhead.  R. 763-64, 910-11.  He listed several of Valentin's medications but did not indicate any of their side effects.  R. 764, 911.  He said that she could tolerate "low"

_____

[4]  The McMurray test is a rotation of the tibia on the femur to determine if there is any damage to the meniscus.  See McMurray t., Steadman's Medical Dictionary 1805 (27th ed. 2000).

[5]  The October 2, 2013, report also includes Dr. Lucas's diagnosis of AC arthritis.  R. 907.

work stress, and said the basis for this conclusion was "intuition." R. 765, 912. He said that she would likely need a half-hour break every half-hour during a workday, would likely miss more than three days of work per month, could not bend, stoop, push, pull, or kneel, and should avoid humidity, temperature extremes, and wetness. R. 765-66, 912-13. In a narrative report on October 20, 2011, Dr. Lucas opined that Valentin's prognosis is "poor," and wrote: "I do not believe she can participate in full time competitive work and that she is disabled permanently." R. 827-28.

### 3. Drs. Torres-Gluck and Kleiman

Neurologists Drs. Torres-Gluck and Anne Kleiman regularly saw Valentin for complaints of neck pain and headaches. See, e.g., R. 375, 428, 437, 449-54, 602-08, 612-14, 664-66, 781-85. At an examination in September 2009, Dr. Torres-Gluck noted that Valentin had neck pain radiating to her left arm associated with numbness and paresthesias.[6] R. 613. She had normal range of motion and power, but x-rays showed degenerative disc disease and reversal of lordosis at C4-5. R. 613-14. He believed that radiculopathy due to degenerative disc disease was likely. R. 614.

Dr. Kleiman provided further treatment in early March 2010 when Valentin complained chiefly of headaches. R. 607. Dr. Kleiman noted a history of "overus[ing] analgesics of man[y] [t]ypes in her frustration over the pain." Id. A cervical spine MRI on March 2, 2010, showed reversal of the normal cervical curvature near the C5-6 vertebrae, patchy bone marrow edema within C6, and herniated discs at C4-5 and C5-6 creating central canal stenosis. R. 376.

---

[6] "Paresthesia" is "[a]n abnormal sensation, such as of burning, pricking, ticking, or tinging." *Paresthesia*, Steadman's Medical Dictionary 1316 (27th ed. 2000).

Reviewing the MRI on April 27, 2010, Dr. Torres-Gluck observed that Valentin had severe degenerative disc disease at vertebrae C4-5, C5-6, and C6-7, with reversal of lordosis and herniation near discs C5-6 and C6-7. R. 453.

At a follow-up consultation on June 14, 2010, a resident noted that Valentin's headaches are likely caused by the stiffness in her neck and a herniated disc, not by migraines. R. 587. Reviewing the resident's findings, Dr. Kleiman reported that Valentin continued to have "paraspinal lower cervical and trapezious muscle spasm[s]" and "decreased cranial range of motion." R. 588. To address the pain, Valentin was prescribed at various points Indocin, Lyrica, Clonazepam, Zanaflex, Lamictal, Ultram, Savella, and Norflex. R. 394, 410, 421, 821.

Valentin continued to complain of back pain after her 2005 lumbar fusion, but a lumbosacral spine MRI showed little besides "[s]hort posterior spinous rods at the L5-S1 level" and "[m]ild lumbar spondylosis." R. 378. She had a surgical breast reduction on October 2, 2010, apparently in an effort reduce back and neck pain. R. 508-10, 641-44.

After her breast reduction, Valentin was considered for cervical surgery. R. 421, 428, 665, 673. She was evaluated at both Metropolitan and the Hospital for Joint Disease at NYU for this treatment. R. 665, 784.[7] Ultimately both the Hospital for Joint Disease and Metropolitan recommended against surgery. See R. 769, 784. Instead she continued to receive pain management treatment from Alexandru Burducea, D.O., at Mount Sinai, as well as at Metropolitan. R. 541-73. She reported great relief — as much as 50% improvement — from the

---

[7] There is only one page in the record, other than Dr. Kleiman's comments, that indicates Valentin received treatment at NYU Medical Center. See R. 512 (request of Dr. Daniel B. Bazylewicz for a cervical epidural injection, based on an MRI showing stenosis at C5-6 and C6-7). There is also an undated referral to the Hosptial for Joint Disease by a Dr. Wickman, as well as a referral to a pain clinic for cervical injections. R. 539-40.

treatment at Mt. Sinai.  R. 552-53.

Dr. Kleiman wrote two reports on Valentin's condition.  The first one, dated August 3, 2011, indicates that it was "written as requested by my patient's attorneys."  R. 684.  Dr. Kleiman explained the history of her treatment of Valentin, noting that Valentin had "two large herniated discs," did not respond to pain management, and was being considered for neurosurgery.  Id.  She said that her examination showed restrictions to Valentin's ability to move her head and neck and use her left arm due to pain.  Id.  Dr. Kleiman said that her patient "remains debilitated, can not [sic] work and is generally disabled" unless she undergoes decompressive surgery.  Id.  In a shorter report written on October 7, 2011, Dr. Kleiman said that Valentin was diagnosed with cervical stenosis and a herniated disc at C4-C5, based on an MRI.  R. 769.  Dr. Kleiman said that, despite physical therapy and pain medication, Valentin "remains limited in her ability to perform her daily activities" and "continues to have limited movement of her head and ongoing pain."  Id.

An MIQ completed by Dr. Kleiman on September 26, 2011, noted that Valentin suffers from "neck pain [due] to cervical radiculopathy [and due] to herniated cervical discs."  R. 751.  Dr. Kleiman noted that Valentin's condition improved moderately with pain management "and may continue to improve slowly," and that Valentin suffers from "cervical muscle spasms," "decreased ability to rotate the head," and "shooting pain into the arms to the hands."  Id. (emphasis in original).  Dr. Kleiman said that her examination and the MRIs of Valentin supported her conclusion.  R. 752.  She opined that Valentin could sit for four hours in an eight-hour work day, and could stand or walk for only two hours; that Valentin could occasionally lift or carry up to five pounds, but that muscle spasms in her neck that are increased with activity may limit her ability to do repetitive reaching, handling, fingering, or lifting; and that Valentin

would have marked difficulty, with either side of her body, grasping, turning, and twisting objects; using her hands or fingers for fine manipulations; or using her arms for reaching, including overhead. R. 753-55. She noted that Valentin is capable of moderate work stress, but would have to take a 15 minute break every two hours, and possibly miss two to three days per month of work. R. 756-57.

### 4. Dr. Eyassu

Dr. Rahel Eyassu conducted a consultative physical evaluation on February 8, 2011. R. 409-13. Dr. Eyassu noted that Valentin complains of chronic neck pain, as well as episodic knee pain, some pain when using her arms, and arthritis. R. 409-10. Dr. Eyassu noted Valentin's claims that she cannot cook, clean, launder, or shop due to pain, but can shower and dress herself. R. 410. Dr. Eyassu observed that Valentin presented herself in mild pain, exhibited difficulty in walking on heels and toes, and declined to squat due to left knee pain. Id. Dr. Eyassu wrote that Valentin could change herself for the exam, could get on and off an exam table, and rise from a chair without difficulty or assistance. Id. Dr. Eyassu observed that "[s]pontaneous movement of the neck elicits pain," but noted no muscle spasms, and that "[p]ushing on top of the head while neck was in flexion did not elicit radicular pain." R. 411. Dr. Eyassu noted that Valentin's left shoulder could raise to 130 degrees and abduct to 130 degrees, adduct and externally rotate without limitation, but only rotate internally "0-30 degrees." R. 412. Dr. Eyassu observed "[f]ull range of motion of hips, knees, and ankles bilaterally," and "[f]ull range of motion of the right shoulder, elbows, forearms, and wrists bilaterally." Id. Dr. Eyassu said that strength was 5/5 in the upper and lower extremities, and that "[h]and and finger dexterity is intact" and grip strength was 5/5. Id. Dr. Eyassu diagnosed Valentin with a history of cervical spine derangement, cervical myelopathy, status post lumber

spine fusion, status post left shoulder rotator cuff repair, status post left knee arthroscopy, arthritis, and depression.  Id.  Regarding her activities, Dr. Eyassu opined that Valentin had only the following limitation: "Marked limitation on activities that would require reaching up, sustained pulling, pushing, excessive neck movement, repetitive bending, lifting, squatting, kneeling, and crawling."  Id.

### 5. Other Treatment at Metropolitan

Valentin received treatment at Metropolitan from rheumatologist Dr. Sushama Mody beginning in December 2010.  E.g. R. 421, 660-61, 673, 821.  Dr. Mody diagnosed her with osteoarthritis in her spine, knees, and shoulders, and with probable fibromyalgia syndrome.  R. 424-25.  Dr. Mody based this initial diagnosis on Valentin's "extensive history of degenerative joint disease," as well as her existing radiology and lab results.  R. 424.  Valentin was treated with "alternating muscle relaxers," Ultram, and Lyrica.  R. 424-25.

Valentin was also treated for bilateral foot pain at Metropolitan in late 2009.  E.g. R. 385, 388, 610.  She received medicated gel, injections, and cold sprays for treatment.  R. 385, 388.

### 6. St. Luke's Roosevelt Hospital Treatment

Valentin began psychiatric treatment at St. Luke's Roosevelt Hospital ("St. Luke's") in Manhattan in January 2010.  See R. 839.  Her diagnosis as of October 26, 2011, was "major depressive disorder, recurrent, moderate severity", evinced by "symptoms of depressed mood, changes in sleep, tearfulness, and anhedonia."  Id.  Other diagnoses and reports have included generalized anxiety disorder, see R. 1005, general affective disorder, see, e.g., 1056, and "personality disorder not otherwise specified", see R. 949, 999.  She was treated by psychiatrists Drs. Joseph Yuen, Abha Gupta, Noam Koenigsberg, and Alexandra Canetti.  See R. 840-48, 944-51, 1041-48, 1250-53.  She was treated by psychologists Drs. Anne Bohraus, Roshnee

Vazquez, and Shara Marrero.  R. 1003-06, 1109-12, 1250-53.  Valentin generally behaved with appropriate affect, eye contact, and speech during her meetings, though with varying insight and judgment.  See R. 930, 1023, 1033, 1109.  She consistently reported "rampaging," or cursing and screaming at others as a way to release her angry feelings, in public and private situations.  See R. 1077, 1096.  However, she reported progress in preventing these episodes and in controlling her anger using techniques learned in therapy.  See R. 930.  Dr. Bohraus also noted possible symptoms of post traumatic stress disorder as well as a very poor memory.  See R. 1104.

In a report dated June 10, 2011, Dr. Yuen said that Valentin had unspecified episodic mood disorder, major depressive disorder (moderate recurrent), and generalized anxiety disorder.  R. 579-80.  He reported that she has "poor emotional capacity to participate in work-related activities" due to causes including "depressed mood, irritability, difficulty with frustration tolerance," and poor ability "to manage interpersonal relationships."  See R. 580.  Dr. Yuen said that he expected, with treatment, that Valentin's issues would be resolved by June 2012, and that she was "temporarily unemployable" for up to one year.  Id.

Dr. Gupta also produced a narrative report on October 26, 2011.  R. 839.  Dr. Gupta stated that Valentin had been a patient at St. Luke's Psychiatric Outpatient Clinic since January 2010.  Id.  He noted that a combination of medication and therapy had helped prevent recurrent episodes of depression.  Id.  An impairment questionnaire completed by Dr. Gupta noted that Valentin has "major depressive disorder, recurrent, moderate," and "personality disorder not otherwise specified."  R. 830.  He noted that she suffered from trouble sleeping, mood disturbance and emotional lability, anhedonia or pervasive loss of interest, difficulty thinking or concentrating, feelings of guilt or worthlessness, hostility and irritability, persistent irrational

fears, intrusive recollections of a traumatic exercise, decreased energy, and social withdrawal or isolation. R. 831. He opined that Valentin had moderate limitations in her ability to sustain an ordinary routine without supervision, to appropriately interact with the general public, to respond to criticism from supervisors, to get along with coworkers without exhibiting behavioral extremes, and to be aware of normal hazards and take appropriate precautions. R. 833-35. He stated that he could not assess Valentin's reactions to work or exacerbation of her symptoms under work stresses, as she was not employed during her treatment. R. 835. But he did note that she could not cope with even "low stress," as she is "easily emotionally dysregulated and labile." R. 836.

Evaluating Valentin on August 2, 2012, Dr. Koenigsberg said that Valentin "reports that her mood fluctuates quite a bit and she is someone whose mood can change on the drop of a hat and she can become very sad or very angry rather quickly." R. 841. PTSD was ruled out. R. 842. He also focused on her personal problems, noting her comments that "she has a hard time realizing how she comes off to other people." R. 841. While Dr. Koenigsberg suggested that she may benefit from group therapy to address this, she did not want to attend because "she does not like to hear other people's problems." R. 843 (internal quotation marks omitted).

Although the record contains no session notes from Drs. Marrero and Canetti, they jointly completed two impairment questionnaires. See R. 900-06, 1250-53. A questionnaire dated September 11, 2013, reported that Valentin had post-traumatic stress disorder, major depressive disorder, recurrent, moderate, and personality disorder not otherwise specified. R. 900. The questionnaire noted clinical findings including poor memory, sleep and mood disturbance, emotional lability, anhedonia, psychomotor agitation or retardation, difficulty thinking or concentrating, feelings of guilt or worthlessness, time or place disorientation, social

13

withdrawal or isolation, decreased energy, intrusive recollections of a traumatic experience, generalized persistent anxiety, and hostility or irritability. R. 901. The questionnaire noted symptoms including flashbacks of trauma, hypervigilence, depression, emotional dysregulation, insomnia, irritability, interpersonal problems, and perceptual disturbances. R. 902. As to limitations, the questionnaire stated that Valentin had moderate limitations to her ability to understand, remember, and carry out detailed instructions (but not one- or two- step ones), remember locations and work-like procedures, and sustain an ordinary routine without supervision. R. 903. It noted marked limitations in her ability to use public transportation, set realistic goals or plans, maintain attention and concentration for extended periods, perform activities within a schedule and be punctual, and work with others without being distracted by them. R. 903-04.[8] It said that she experienced episodes of severe anxiety, "sometimes with dissociation or perceptual disturbances," when faced with triggers of past traumas. R. 904. The questionnaire stated that Valentin experienced "chronic irritability, anxiety, poor attention and concentration, and interpersonal problems in the context of recovery from trauma," all of which make her incapable of tolerating even "low stress." R. 905. It estimated that she would miss work more than three times a month as a result of her mental impairments. R. 906. It stated that Valentin's symptoms and limitations began "2/3/10 or earlier." Id.

The second questionnaire, dated March 12, 2014, just after the conclusion of the period at issue, stated that Valentin could understand and carry out simple instructions, but had moderate difficulty making judgments on simple work-related decisions or understanding and carrying out complex instructions, as she sometimes had dissociations or perceptional disturbances, including

---

[8] It appears a page of this report, which contains a listing of additional areas for rating, is missing from the record.

"fugue states." R. 1251. The questionnaire noted that she had moderate difficulties interacting with the public, and marked difficulty interacting appropriately with supervisors and co-workers and responding to usual work situations and changes in routine work settings. R. 1252. It stated that these were caused by "significant chronic affect dysregulation and interpersonal problems in the context of recovery from complex trauma over the course of her lifetime." Id. It added that Valentin was limited in her ability to set realistic goals and make independent plans, due to "chronic insomnia, anxiety, flashbacks from past trauma, hypervigilance, depression, irritability, emotional dysregulation, interpersonal problems and perceptional disturbances." Id. It stated that these conditions first presented themselves in May 2009, "and earlier due to trauma over lifetime." Id.

       7.  FEGS Doctors

Valentin also received treatment from doctors at Federation Employment and Guidance Services ("FEGS") in April 2011 and October 2012. See R. 1179-1249. A FEGS social worker, Robin Kaynor, noted that Valentin took the subway to her appointment. R. 1189. She noted that Valentin suffered from ongoing depression, with a 14 on the PHQ-9 test.[9] Id. Her report indicates that Valentin could complete basic household chores such as doing the dishes, washing clothing, vacuuming or sweeping and mopping the floor, grocery shopping, cooking, and basic hygiene, but that her fibromyalgia, arthritis, and other ailments create physical limitations. R. 1190-91. FEGS doctors Robert London, Hun Han, and Harvey Barash also reported a history of

---

[9] The PHQ-9, or "Patient Health Questionnaire," is a self-administered questionnaire that measures depression. See Kurt Korenke, M.D., et al., The PHQ-9: Validity of a Brief Depression Severity Measure, 16 J. Gen. Internal Med. 606, 606 (Sept. 2001), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268/. A score of 14 indicates "moderate" to "moderately severe" depression. Id. at 608-09.

mental illness (affective disorders) and physical impairments that render her "permanently disabled from work."  See R. 1206-07, 1228-35, 1240-41.

Dr. David Guttman also examined Valentin on April 1, 2011.  R. 1195-1202.  After his single examination, Dr. Guttman found that Valentin suffered from unspecified episodic mood and personality disorders, fibromyalgia, arthritis, neck pain, and other maladies.  R. 1199-1200.  He said that her abilities to bend, climb, lift, reach, stand, and walk were "limited," R. 1200, but that she had no restrictions on sitting at work, although she should remain in a low stress environment, R. 1197.

### 8.  Examining Psychiatric Sources

Two examining psychiatrists submitted reports on Valentin's condition.  Consulting psychiatrist Dr. Haruyo Fujiwaki examined Valentin on February 8, 2011.  See R. 414-18.  Dr. Fujiwaki noted that Valentin took a train to the evaluation, and that she had not been employed since 2009, when she "was fired after she was involved in some kind of incident."  R. 414.  She said that Valentin reported difficulty sleeping, loss of appetite, depression attributed to "negative childhood experiences and marriage problems," crying spells, hopelessness, loss of usual interests, and concentration difficulties.  R. 414-15.  She noted Valentin's reports that she gets anxious, especially when angry, but that she denies manic and psychotic symptoms.  R. 415.  Dr. Fujiwaki found that Valentin's demeanor and responsiveness to questions was cooperative, and her "[m]anner of relating, social skills, and overall presentation was adequate."  Id.  Although she appeared tense, Valentin's eye contact, speech and language skills, and thought processes were all appropriate, and she displayed "no evidence of hallucinations, delusions, or paranoia in

the evaluation setting." Id. Dr. Fujiwaki reported that Valentin's mood was dysthymic,[10] she was well oriented to person, place, and time, and her attention and concentration, memory skills, and cognitive functioning were all intact, although her insight was only fair and her judgment was fair to poor. R. 416. Dr. Fujiwaki noted Valentin's claims that "she is able to dress, bathe, and groom herself," but "does not do cooking, cleaning, and laundry because she is in pain." Id. Dr. Fujiwaki reported Valentin's assertions that her daughter does most of the household chores, her son helps her with food shopping, she can manage money and take public transportation alone, but does not socialize and does not have friends. Id.

Vocationally, Dr. Fujiwaki said that Valentin "is able to follow and understand simple directions and instructions," and "perform simple tasks independently." Id. She reported that Valentin could learn new tasks, perform complex tasks with supervision, make simple decisions, and maintain a regular schedule. Id. But she noted that Valentin "may have difficulty relating with others and dealing with stress appropriately." Id. Overall, Dr. Fujiwaki diagnosed Valentin with mood disorder not otherwise specified, dysthymic disorder, and anxiety disorder not otherwise specified. R. 417.

Dr. Robert Goldstein submitted a narrative and questionnaire on September 28, 2012. R. 849-63. After interviewing Valentin and reviewing "relevant materials pertaining to her case," R. 851, he concluded that she suffers from major depressive disorder, recurrent, severe with psychotic features, R. 854. He said that these conditions are exacerbated by her fibromyalgia. Id. He opined that, "[a]s a result of her overall condition, her functioning has deteriorated in all areas, e.g. occupationally, socially, etc. She is unable to work at any job in the national

---

[10] Dysthymia is persistent, chronic depression. See Dysthymia, Steadman's Medical Dictionary 556 (27th ed. 2000).

economy. She is totally and permanently disabled." R. 855. His questionnaire reported that Valentin has poor memory, appetite disturbance with weight change, sleep and mood disturbances, a personality change, delusions or hallucinations, anhedonia or pervasive loss of interest, paranoia or inappropriate suspiciousness, feelings of guilt or worthlessness, difficulty thinking or concentrating, suicidal ideation or attempts, perceptual disturbances, social withdrawal or isolation, and decreased energy. R. 857.

Dr. Goldstein said that Valentin would struggle to understand, remember, and carry out detailed instructions, had marked limitations in her ability to maintain her concentration, keep to a routine, or work with others without being distracted by them, and would struggle to complete a normal work week without an unreasonable number and length of rest periods. R. 859-60. He reported that she would have marked limitations in interacting with the public, her coworkers, and her supervisors, and in maintaining socially appropriate behavior, neatness, and cleanliness. R. 860. He noted similar limitations to her ability to set realistic goals or make independent plans, to respond appropriately to changes in the work setting, and to be aware of normal hazards and take precautions. R. 860-61. He said that she had moderate limitations to her ability to use public transportation. R. 861. He said that she would be incapable of tolerating even "low stress" at work, and that all of her days equal "bad days." R. 862. He stated that she has been "totally unable to work" since May 2009. R. 863.

D. The ALJ's April 9, 2014 Decision

In her April 9, 2014, decision, the ALJ found that Valentin met the insured status requirements of the Social Security Act through December 31, 2014; that she had not engaged in substantial gainful activity since May 18, 2009, the date she claimed she became disabled; and that she had a number of conditions that constituted severe impairments under the Social

18

Security Act and SSA regulations, including "cervicalgia, status post arthroscopic left knee surgery, status post arthroscopic left shoulder surgery, fibromyalgia, migraine headaches, bilateral hallux valgus deformity, status post lumbar spine fusion, obesity, depression, and generalized anxiety."  R. 27.

At step three of her evaluation, the ALJ concluded that none of Valentin's impairments nor a combination of her impairments "meets or medically equals the the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  Id.  The ALJ specifically addressed the "paragraph B" criteria for mental impairments or anxiety-related disorders and "paragraph C" criteria for "chronic affective disorder[s]" that cause extended episodes of decompensation or would be predicted to cause decompensation if even a minimal change in environment occurred.  R. 28-29 (referencing 20 C.F.R. Part 404, Subpart P, App'x 1, §§ 12.04(B)-(C), 12.06(B)-(C)).  The ALJ found that Valentin had no restriction in activities of daily living; had moderate difficulties in social functioning such that she could only have "occasional contact with others" in the workplace; and had moderate difficulties with concentration, persistence, or pace, but could carry out one or two step instructions and maintain concentration for extended periods.  Id.

The ALJ found that Valentin "ha[d] the residual functional capacity to perform sedentary work," except that she could only occasionally use her left non-dominant hand and could only perform simple work with occasional contact with others.  R. 29.  The ALJ acknowledged Valentin's claims that a combination of physical and mental impairments rendered her disabled, but concluded that "treatment notes, objective studies, and [Valentin's] own statements do not fully support her allegations."  R. 30.  The ALJ noted that, despite Valentin's surgeries and conditions prior to 2009, she continued to work until she was fired.  Id.  The ALJ detailed

Valentin's treatment history after her alleged date of disability, referencing notes from her treating doctors and from SSA consultations. R. 30-35. The ALJ concluded that "the opinions and findings of Drs. Gupta and Fujiwaki support a finding that the claimant's symptoms have improved with medication and therapy as admitted by the claimant at the hearing." R. 35. Accordingly, the ALJ found, Valentin "is able to perform simple work with occasional contact with others." Id.

The ALJ discounted the opinions of Drs. Guttman, Gupta, Fujiwaki, Canetti, and Marrero regarding Valentin's tolerance for stress. R. 35-36. The ALJ opined that "stress" must be precisely defined, "and if an examiner is relying on subjective complaints, there should be some clarification as to what is causing the 'stress.'" R. 35 (referencing *General - Development of Vocational Evidence,* Social Security Programs Operations Manual System DI 22515.001(B)(5) (July 9, 2012), http://policy.ssa.gov/poms.nsf/lnx/0422515001 ("POMS DI 22515.001(B)(5)")). Because the examiners "made general statements about 'stress' without defining what would cause the stress," the ALJ gave those portions of these doctors' reports little weight. R. 36. The ALJ stated that she "accounted for the claimant's mental impairments by finding that she can perform simple work with occasional contact with others." Id.[11]

The ALJ gave "great weight" to Dr. Fujiwaki's opinion, "partial weight" to Dr. Gupta's opinion, and "little weight" to the opinions of Drs. Goldstein, Canetti, and Marrero. R. 36. The ALJ decided their findings that Valentin had "moderate to marked limitations" were contradicted by the treatment records from St. Luke's, Valentin's statements to Dr. Fujiwaki and Robin

[11] The ALJ also gave limited weight to the "State agency psychological consultant" Dr. E. Kamin's mental assessment because he was a non-examining source and significant evidence was provided after that report was made. R. 38 (referencing R. 466-83). Dr. Kamin had found that Valentin had no marked limitations in her ability to function. R. 480-81.

Kaynor, and internal inconsistences within the reports themselves, such as the lack of evidence that Valentin cannot understand, remember, and carry out simple one or two-step instructions. Id. While the ALJ acknowledged the treating source rule, she noted that some issues are not medical ones, but administrative findings reserved for the Commissioner to determine. R. 37 (citing 20 C.F.R. §§ 404.1527(e), 416.927(e)). For this reason the ALJ did not credit the conclusions of various doctors that Valentin is "permanently disabled from work." Id.

The ALJ then considered the opinions of Drs. Kleiman and Lucas in more detail, deciding to give them little weight. R. 37-38. The ALJ found that their opinions contradicted each other, and were not "fully supported by the record including diagnostic studies." R. 38. Dr. Lucas's exam of June 16, 2011, for example, found that Valentin had "left shoulder pain to palpation," but "ac joint [at] full motion and full strength." R. 37-38 (referencing R. 634). An MRI showed "no rotator cuff tear flat acromion." R. 38. Dr. Lucas's report also referenced Valentin's pain in her left knee "to lateral joint line" but "negative McMurray test and no pain or laxity to varus or valgus strain." Id. Nevertheless, Dr. Lucas reported that Valentin was "disabled" due to "multiple chronic regional pain syndromes." Id. (internal quotation marks omitted). The ALJ also found that Dr. Lucas's report contradicted Dr. Kleiman's. For example, the ALJ observed that Dr. Kleiman's report indicated Valentin could sit for four hours, stand or walk for two hours, and occasionally lift and carry up to five pounds during an eight-hour workday. Id. (referencing R. 751-58). However, the ALJ observed, Dr. Lucas's report said that Valentin can only sit for up to one hour, stand for up to one hour, and occasionally lift and carry up to 10 pounds. Id. (referencing R. 760-67). According to the ALJ, Dr. Lucas also found that Valentin could not push, pull, kneel, bend, or stoop, but Dr. Kleiman did not. Id. The ALJ also referenced Valentin's statements to FEGS that she could wash dishes, wash clothes, sweep and

mop the floor, vacuum, make beds, shop for groceries, cook meals, get dressed, and bathe. Id. (referencing R. 1190). The ALJ noted Valentin's statements that her pain was manageable, and that her condition improved, with the use of medication. Id. (referencing R. 1130-31, 1138, 1144). Based on these inconsistencies with the record, the ALJ gave little weight to the opinions of Drs. Kleiman and Lucas. Id.

The ALJ also gave little weight to the opinion of Dr. Yuen. Id. Although the ALJ took note of Dr. Yuen's opinion that Valentin "is disabled for one year," she found this opinion conclusory and said that it "encroach[ed] on a finding reserved to the [C]ommissioner." Id. (referencing R. 579-80). The ALJ also observed that Dr. Yuen's 2011 report estimated that Valentin's condition would improve within one year. See id.

The ALJ afforded Dr. Eyassu's opinion partial weight. Id. The ALJ accepted that Valentin's injuries would prevent her from more than occasional use of her left non-dominant hand. See id. But to the extent Dr. Eyassu suggested that Valentin had limitations with both arms, the ALJ found that Dr. Eyassu's own clinical observations contradicted such a conclusion, as they stated that she had "full range of motion" with "hand and finger dexterity" intact on her right arm. Id. (referencing R. 412). The ALJ also gave little weight to the State Agency Physical Residual Functional Capacity Assessment, as that consultant was non-examining and did not reflect subsequently submitted evidence. Id. (referencing R. 484-90).

Turning to Valentin's testimony, the ALJ found her partially credible, but found "no credible evidence in the record" that her medications did not reduce her symptoms to the point where she was not disabled. R. 38-39. According to the ALJ, Valentin's treatment record contradicted her claims that her medication's side effects significantly interfered with her daily activities. R. 39. For example, the ALJ noted observations in the record that Valentin

22

"generally had normal speech, fair eye contact, and appropriate affect" during consultations.  Id.
The ALJ said that the treating records "make repeated references to [Valentin] having no
hallucinations, with no racing thoughts, no delusions, and no loose associations."  Id.
Accordingly, the ALJ concluded that the credible evidence in the record showed Valentin had
the residual functional capacity to perform "sedentary work that does not require more than
occasional use of the left, non-dominant hand" and "simple work with occasional contact with
others" based on her physical and mental conditions.  Id.

The ALJ then used this assessment to determine what jobs Valentin could perform.  She
found that Valentin could not perform her past work as a teacher's aide or respite worker as
these involved "light work."  Id.  The ALJ also observed that the claimant was in the age
category of "younger individual" before December 29, 2013, but in the category of "closely
approaching advanced age" after that date.  Id.  Based on the testimony of the vocational expert,
the ALJ found that jobs existed in significant numbers in the national economy that Valentin
could perform, given her residual functional capacity ("RFC"), as a "younger individual."  R. 40-
41.  However, once Valentin became an individual "closely approaching advanced age,"
considering her age, education, and work experience, the ALJ found that a finding of "disabled"
was appropriate.  R. 41.  Accordingly, the ALJ found that Valentin was not disabled before
December 29, 2013, but became disabled and has been disabled since that date.  Id.

II.  APPLICABLE LAW

A.  Scope of Judicial Review under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining
whether the [Commissioner's] conclusions were supported by substantial evidence in the record
and were based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013)

(citations and internal quotation marks omitted); accord Greek v. Colvin, 802 F.3d 370, 374-75 (2d Cir. 2015); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Greek, 802 F.3d at 375; Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted).  Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists."  Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)).  The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard."  Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (citation omitted).  "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise."  Id. (emphasis in original) (citations and internal quotation marks omitted).  "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision."  Johnson, 563 F. Supp. 2d at 454 (citations and internal quotation marks omitted).  Importantly, it is not a reviewing

court's function "to determine de novo whether [plaintiff] is disabled." Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (alteration in original) (citation and internal quotation marks omitted); accord Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012).

B. Legal Standard Governing Evaluation of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see id. § 1382c(a)(3)(A). A person will be found to be disabled only if it is determined that her "impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To evaluate a claim of disability, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam) (citation and internal quotation marks omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process). First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(a)(4)(I). Second, if the claimant is

not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," id. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," id. §§ 404.1520(c), 416.920(c).  Third, if the claimant's impairment is severe and "meets or equals" one of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1, and "meets the duration requirement," the claimant must be found disabled.  Id. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  Fourth, if the claimant's impairment does not meet or equal one of the listed impairments, or does not meet the duration requirement, the Commissioner must review the claimant's residual functional capacity to determine if the claimant is able to do the work he or she has done in the past, i.e., "past relevant work."  Id. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant is able to do such work, he or she is not disabled.  Id. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's residual functional capacity, in addition to his or her age, education, and work experience, permit the claimant to do other work.  Id. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant cannot perform other work, he or she will be deemed disabled.  Id. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The claimant bears the burden of proof on all of these steps except the final one — that is, proving that there is other work the claimant can perform. See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

C. <u>The Treating Source Rule</u>[12]

In general, the ALJ must give "more weight to medical opinions" from a claimant's treating sources when determining if the claimant is disabled. <u>See</u> 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); <u>see also</u> <u>Halloran v. Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (the ALJ must give "a measure of deference to the medical opinion of a claimant's treating physician"). Treating sources "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ must accord "controlling weight" to a treating source's medical opinion as to the nature and severity of a claimant's impairments if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." <u>Id.</u> §§ 404.1527(c)(2), 416.927(c)(2). Inversely, the opinions of a treating source are not afforded controlling weight where the treating source's opinions "are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." <u>Halloran</u>, 362 F.3d at 32; <u>accord</u> <u>Greek</u>, 802 F.3d at 375.

If the ALJ does not give controlling weight to a treating source's opinion, the ALJ must provide "good reasons" for the weight given to that opinion. <u>Halloran</u>, 362 F.3d at 32-33 (quoting 20 C.F.R. §§ 404.1527(c)(2); and citing <u>Schaal</u>, 134 F.3d at 503-04). When assessing how much weight to give the treating source's opinion, the ALJ should consider factors set forth in the Commissioner's regulations, which include (I) the length of the treatment relationship and

_____

[12] Regulations that came into effect on March 27, 2017, slightly alter the prior "treating physician" rule, introducing the term "treating source." <u>See</u> 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). The changes have no impact on this decision.

the frequency of the examination; (ii) the nature and extent of the treatment relationship; (iii) the supportability of the opinion with relevant evidence, particularly medical signs and laboratory findings; (iv) the consistency of the opinion with the record as a whole; (v) whether the opinion is from a specialist; and (vi) other relevant evidence. See 20 C.F.R. §§ 404.1527(c), 416.927(c); see also Ellington v. Astrue, 641 F. Supp. 2d 322, 330-31 (S.D.N.Y. 2009) ("[T]he ALJ should weigh the treating physician's opinion along with other evidence according to the factors" listed in 20 C.F.R. § 404.1527(c).). The Second Circuit has stated that it will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and . . . will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33 (apostrophe omitted). However, where other evidence from treating sources exists in the record, even an erroneous rejection of a treating source's report is not always reversible error. Compare Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's wrongful rejection of treating physician's medical opinion was not prejudicial error because it was "essentially duplicative" of a largely identical report by the same doctor), with Greek, 802 F.3d at 376 (wrongful rejection of treating source's relevant testimony was prejudicial because no other comparable evidence by treating sources existed in the record).

III. DISCUSSION

Valentin makes two arguments challenging the ALJ's decision: (1) that the ALJ violated the treating source rule; and (2) that the ALJ improperly evaluated Valentin's credibility. See Pl. Mem. at 19, 28.

A.  <u>Treating Source Rule</u>

1.  <u>Physical Impairments</u>

Valentin's first argument focuses on the ALJ's rejection of the conclusions of Drs. Kleiman and Lucas.  <u>Id.</u> at 20.[13]  The ALJ did not give controlling weight to the doctors' opinions because she found that they were inconsistent with their own clinical reports and diagnostic studies, contradicted each other, and were not otherwise fully supported by the record. R. 37-38.

We agree that the ALJ incorrectly found that these doctors' opinions contradicted each other to such an extent that doubt is cast on their conclusions.  While Dr. Kleiman concluded that Valentin could sit for up to four hours and Dr. Lucas concluded she could sit for up to one hour, both conclusions are consistent in the critical determination that Valentin was not able to sit for a full work day, which for sedentary work is six hours.  <u>See</u> SSR 96-9p, 61 Fed. Reg. 34478, 34480 (July 2, 1996); <u>see</u> <u>also</u> <u>McIntyre v. Colvin</u>, 758 F.3d 146, 152 (2d Cir. 2014) ("'[S]edentary work' is generally defined as work in a sitting position for six hours of an eight-hour workday.").

Significant other evidence in the record, however, supported the ALJ's conclusion that these sources' opinions were not entitled to controlling weight.  First, other medical opinions directly contradicted these sources' opinions of Valentin's ability to sit for prolonged periods. Dr. Guttman concluded that Valentin had no restrictions on sitting.  R. 1197, 1200.  Dr. Eyassu

---

[13]  We do not view Valentin as challenging the ALJ's decision to discount any treating source's opinion that Valentin was "disabled."  <u>E.g.</u> R. 37.  As the ALJ properly concluded, that is a determination reserved for the Commission.  <u>See</u> 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); <u>Snell v. Apfel</u>, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative.").

found that Valentin's injuries limited her ability to reach up, pull, push, move her neck, bend repeatedly, lift, squat, kneel, or crawl, but found no limitations on sitting. R. 412.[14]  Although these doctors are both consulting sources, and Valentin is correct that consulting physicians' opinions are generally entitled to less weight than those who have examined an applicant a number of times,  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), they may be favored where a treating source's opinion does not have adequate support, see, e.g., Wells v. Colvin, 87 F. Supp. 3d 421, 434 (W.D.N.Y. 2015) (ALJ permitted to assign treating source less weight in favor of other examiners when treating source's own records did not support his opinion); Evans v. Comm'r of Soc. Sec., 110 F. Supp. 3d 518, 536-37 (S.D.N.Y. 2015) (objective medical records supported ALJ's decision to accord little weight to medical source's inconsistent opinion); Coluciello-Pitkouvich v. Astrue, 2014 WL 4954664, at *5-6 (E.D.N.Y. Sept. 30, 2014) (treating physician's opinion properly discounted when it was inconsistent with test results and opinions of other physicians in the record).

After she reviewed the record in detail, the ALJ could properly conclude that there was not strong support for Dr. Lucas's opinion.  It is true that Dr. Lucas's 2011 analysis diagnosed Valentin with "fibromyalgia with [degenerative joint disease] of spine, spinal stenosis," and "chronic fatigue syndrome," R. 760, and "multiple chronic regional pain syndromes," R. 794.  It is also true that Dr. Kleiman's report from that year observed muscle spasms in Valentin's neck, neck pain, and cervical spine stenosis.  R. 684.  Indeed, the ALJ accepted Dr. Kleiman's opinion that Valentin has "limited use of her left arm because of pain."  Id.; see R. 39.  But the ALJ cited

---

[14]  The ALJ properly accepted only Dr. Eyassu's diagnosis regarding Valentin's left arm, given the doctor's report that Valentin "has full range of motion of the right shoulder, elbows, forearms, and wrists bilaterally and hand and finger dexterity is intact."  R. 38 (citation and internal quotation marks omitted).

a number of reports in the record indicating that medication provided great relief to Valentin's pain.  See, e.g., R. 553, 1130-31, 1138, 1144.  A reasonable mind might accept that this evidence sufficiently contradicts Drs. Kleiman and Lucas' conclusions regarding the severity of Valentin's conditions.[15]  Once the ALJ made that determination, and reasonably decided that Drs. Kleiman and Lucas' opinions were not entitled to controlling weight, it was her role to weigh the evidence and medical opinions in the record to determine the level of Valentin's physical impairment.  See Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); accord Ruff ex rel. LMF v. Colvin, 2015 WL 694918, at *11 (S.D.N.Y. Feb. 18, 2015); Montaldo v. Astrue, 2012 WL 893186, at *14 (S.D.N.Y. Mar. 15, 2012).

Turning to the evidence itself, Valentin argues that the ALJ (1) did not properly identify the "diagnostic studies" that contradicted the treating sources' findings; (2) did not address whether Valentin could sit long enough to perform sedentary work; (3) put too much emphasis on her "response to treatment,"; and (4) placed too great an emphasis on Valentin's ability to perform activities of daily life.  Pl. Mem. at 20-23.  All of these arguments lack merit.

First, the "studies" the ALJ refers to in her opinion are identified in her comparison of the treating sources' records.  The ALJ referenced Dr. Lucas's June 16, 2011, exam, which showed "left shoulder pain to palpation," but "ac joint full motion and full strength," and "an MRI showed no rotator cuff tear flat acromion."  R. 37-38.  Similarly, "[i]t was also noted that [there

---

[15]  Valentin claims that the ALJ selectively chose records that showed modest response to treatment.  See Pl. Mem. at 22.  The fact that Valentin showed improvements, however, supports a finding that any pain was temporary and not permanent.  Compare R. 665 (May 12, 2011, epidural injections and trigger point injections not helping patient), with R. 1144 (June 7, 2012, "[p]atient today reports improvement of pain, after taking [medication]; patient said [she] is controlled when she takes her medications"), R. 1138 (November 8, 2012, "[p]atient continues to report good relief . . . with current medications"), and R. 1130-31 (May 16, 2013, same).

was] left knee with pain to lateral joint line, but negative McMurray test and no pain or laxity to varus or valgus strain," and "[a]nkles had full motion bilaterally with no pain to palpation of ligaments." R. 38. The treatment notes in the record accurately reflect the ALJ's description. See, e.g., R. 794 (Dr. Lucas treatment notes from July 28, 2011), R. 376 (March 2, 2010, MRI showing cervical spondylosis), R. 499 (September 18, 2008, left shoulder MRI showing no rotator cuff tear). Given this evidence, it was within the ALJ's authority to decide that Dr. Eyassu's analysis of Valentin was the most consistent with the medical record of the three contrasting reports. See Halloran, 362 F.3d at 32-33 (ALJ offered good reasons to accept examining source's findings as more consistent with record than treating source's); Browne v. Comm'r of Soc. Sec., 131 F. Supp. 3d 89, 99-100 (S.D.N.Y. 2015) (proper for ALJ to give treating source's opinion less than controlling weight when it was inconsistent with other substantial medical evidence in record).

Second, although the ALJ made no specific finding as to Valentin's ability to sit for extended periods, the ALJ did review the conflicting medical source opinions on the subject. She noted Dr. Kleiman's suggestion that Valentin could sit for four hours, Dr. Lucas's suggestion that she could sit for up to one hour and needed to change position every 30 minutes, and Dr. Guttman's finding that she had no limitation sitting. See R. 31-32. Dr. Eyassu — despite discussing Valentin's complaints of "tightness" in her lower back which worsened when sitting too long, and finding a number of marked limitations to Valentin's physical abilities — also found no limitation to Valentin's ability to sit. R. 409-12. Of these four doctors, only Dr. Lucas mentioned lower back pain as a persistent symptom. R. 827-28. Drs. Eyassu, Kleiman, and Guttman all focused on Valentin's pain in her shoulder and neck. See R. 409-13, 751-58, 769, 1200. Additionally, as the ALJ observed, Valentin was able to continue working until

2009, even though she had a lumbar fusion in 2005. R. 30. When a treating source's opinion is not supported by underlying medical evidence or other proof in the record, including the treating notes and findings of other physicians, the ALJ is not obligated to accept it. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3); <u>Monroe v. Comm'r of Soc. Sec.</u>, 676 F. App'x 5, 8 (2d Cir. 2017) (summary order) (although treating source's medical source statement was "supported by <u>some</u> evidence," ALJ's decision to disregard it was substantially supported by record) (emphasis in original); <u>see also</u> <u>Veino</u>, 312 F.3d at 588 ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.") (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 399 (1971)).

Third, the ALJ did not "pick and choose" from the record, <u>Sutherland v. Barnhart</u>, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004), but properly weighed conflicting opinions regarding the effective treatment of Valentin's allegedly disabling "multiple chronic regional pain syndromes," R. 38 (citing Dr. Lucas's treatment reports, R. 634). Although, as Valentin notes, Pl. Mem. at 22, some injections that provided "great relief" initially had no lasting effect by May 12, 2011, R. 665,[16] her treatment records consistently indicate that her medication, including Lyrica and Norflex, kept her pain symptoms "relatively well controlled," <u>see</u> R. 1130-31 (May 16, 2013), R. 1134-35 (Feb. 14, 2013), R. 1138-39 (Nov. 8, 2012). The ALJ also considered a number of additional factors in evaluating Valentin's ailments, including her descriptions of her symptoms, her activities of daily living, and her reports of how she finds relief, including the type and dosage of her medication. <u>See</u> R. 38-39. A reasonable mind could agree with the ALJ's finding that, with these treatments, Valentin could still perform sedentary work that only occasionally required the use of her left hand.

---

[16] Other reports indicate "moderate relief" from these injections. <u>E.g.</u> R. 1154 ("Pt reported relieve [sic] of pain immediately after" trigger point injections).

Finally, in analyzing if Valentin's treating sources' opinions were consistent with the record as a whole, the ALJ mentioned Valentin's activities of daily life.  R. 38.  We agree that if the ALJ had based her decision that Valentin is not disabled on her report of these activities without discussing how it demonstrated her ability to perform full-time work, the ALJ would have committed error.  See generally Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 643 (2d Cir. 1983) (while claimant watched television, read, rode buses and subways, and conducted similar activities, there was no evidence that claimant engaged in these activities "for sustained periods comparable to those required to hold a sedentary job"); McAllister v. Comm'r of Soc. Sec., 2015 WL 164783, at *10 (N.D.N.Y. Jan. 13, 2015) (ALJ properly made credibility finding where claimant's report of activities of daily living was not the "sole basis" for rejecting claimant's subjective testimony).  However, the ALJ did not use these activities on their own to demonstrate Valentin's impairments, but to demonstrate why the opinions of Drs. Kleiman and Lucas were not entitled to controlling weight.  See R. 38.  This use of Valentin's description of her daily life, when combined with a review of medical findings and other evidence in the record, is appropriate where the claim is made that pain rendered the claimant unable to work.  Cf. 20 C.F.R. §§ 404.1529(c)(3) (daily activities is appropriate factor to consider when evaluating symptoms).

In sum, the ALJ did not commit legal error when considering Valentin's physical impairments, and substantial evidence supports her decision as to Valentin's physical residual functional capacity.

### 2.  Mental Impairments

Valentin also objects to the ALJ's consideration of the opinions of her psychologists and psychiatrists, treating doctors Canetti, Gupta, Marrero, and Yuen and examining doctors

Fujiwaki and Goldstein. See Pl. Mem. at 25-28. She argues that the ALJ should have given controlling weight to the opinions of Drs. Canetti and Marrero or, in the alternative, given their opinions "full consideration" under the regulations. Id. at 27-28. She also argues that the ALJ could not "discount the opinions from every medical source in the record that Ms. Valentin cannot handle stress in the workplace simply because they did not identify the cause of stress." Id. at 26.

The ALJ gave little weight to the opinions of Drs. Canetti, Goldstein, and Marrero because their "opinions of significant limitations are contradicted by the claimant's extensive treatment records" and "internal inconsistencies" in these doctors' reports. R. 36. With regard to Drs. Canetti and Marrero, this analysis satisfied the treating source rule. Valentin's extensive treatment records from St. Luke's show that she generally had normal speech, good to fair eye contact, and appropriate affect; her concentration, memory function, judgment, and insight were all intact and present; and while she was depressed and struggled with anger issues, she also showed progress with medication and counseling. See, e.g., R. 930, 934, 938, 944, 952, 960, 964, 968, 974, 979, 981, 1009, 1023, 1033, 1039, 1054, 1069, 1071, 1085, 1096, 1100, 1104, 1109. Despite this, the reports of Drs. Canetti and Marrero indicate that Valentin had "poor short term memory," chronic problems with "irritability" and concentration, and marked or moderate limitations to her ability to understand, remember, and carry out detailed instructions; to maintain regular attendance and punctuality; to sustain an ordinary routine; to use public transportation; and to set realistic goals or make plans independently. R. 900-06, 1250-53. The ALJ also noted Drs. Canetti and Marrero's acknowledgment that Valentin can understand, remember, and perform one or two-step instructions without issue. R. 903. There are sufficient discrepancies between Valentin's diagnostic reports and the conclusions of these treating sources

to permit the ALJ to discount the opinions of these doctors.

Substantial evidence also supports the ALJ's finding that the opinions of treating psychiatrist Dr. Gupta and examining psychiatrist Dr. Fujiwaki were most consistent with the record. Dr. Fujiwaki noted that Valentin took a train to her evaluation, which directly contradicts the findings of Drs. Canetti and Marrero that she is unable to use public transportation. R. 414; cf. R. 904. Consistent with her treatment history — as well as the findings generally of the other psychiatrists and psychologists — Dr. Fujiwaki acknowledged that Valentin could "follow and understand simple directions and instructions," but "needs supervision" and "may have difficulty relating with others and dealing with stress appropriately." R. 416. Dr. Gupta also affirmed that Valentin suffers from depression and anxiety and has moderate problems interacting with the public, accepting and responding to criticism, and relating with co-workers or peers, but could remember and carry out one or two-step instructions and maintain attention and concentration for extended periods. R. 830-39.

The ALJ's decision founders, however, on the question of whether the ALJ appropriately addressed the question of "stress." Valentin argues that the ALJ failed to give good reasons for discounting the opinion of every psychiatrist and psychologist regarding Valentin's ability to handle stress. Pl. Mem. at 26. Indeed, every professional who analyzed Valentin's mental functions indicated that she struggled with the stresses of interacting with others, with indications that her interactions with supervisors or peers were the "stressors." See, e.g., R. 416 (Dr. Fujiwaki), R. 834-36 (Dr. Gupta), R. 856-63 (Dr. Goldstein), R. 900-06 (Drs. Canetti and Marrero), R. 1197 (Dr. Guttman); see also R. 888 (opinion of FEGS physician Hun Han indicating "[reduced] sustained concentration tolerance for stress and ability[]to adhere to a regular work routine"), R. 1023 (Dr. Gupta, "[Valentin] feels she does not have a way to cope

with stressors in her life").

The ALJ recognized the consistent conclusions that Valentin could not handle stress, but found that all these conclusions should be discounted because none of the evaluators had "defin[ed] what would cause the stress." R. 36. The ALJ relied on SSR 85-15 which provides in pertinent part:

> The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. . . . [A]n individual who cannot tolerate being supervised may not be able to work even in the absence of close supervision; the knowledge that one's work is being judged and evaluated, even when the supervision is remote or indirect, can be intolerable for some mentally impaired persons. Any impairment-related limitations created by an individual's response to demands of work, however, must be reflected in the RFC assessment.

SSR 85-15, 1985 WL 56857, at *6 (Jan. 1, 1985) (emphasis in original). The problem with the ALJ's analysis is that nothing in this statement suggests that opinions of psychologists or psychiatrists regarding a claimant's inability to handle stress are defective merely because the opinions do not specify the causes of stress.

The ALJ also referred to the Social Security Administration's program operations manual. See R. 35 (citing POMS DI 22515.001(B)(5)). The ALJ noted that the manual indicates that stress must be "precisely defined and if an examiner is relying on the claimant's subjective complaints, there should be some clarification as to what is causing the 'stress.'" Id. It appears, however, that the ALJ viewed the manual as a direction to examining and consultative physicians. In fact, it operates as a guide for the SSA. See generally Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler, 537 U.S. 371, 385 (2003) ("[POMS], the publicly available operating instructions for processing Social Security claims . . . ."); Lopes v. Dep't of Soc. Servs., 696 F.3d 180, 186 (2d Cir. 2012) ("The POMS is a

set of guidelines through which the Social Security Administration further construes the statutes governing its operations.") (citation and internal quotation marks omitted); see also *POMS Home Page*, Social Security Administration, https://secure.ssa.gov/apps10/poms.nsf/Home?readform ("The POMS is a primary source of information used by Social Security employees to process claims for Social Security benefits.") (emphasis added). It does not relieve the ALJ of the burden of determining how opinions from psychologists and psychiatrists that a claimant cannot tolerate stress may impact the claimant's ability to engage in work.

It would be one thing if the ALJ had accepted these opinions and then obtained or marshaled evidence showing that there were jobs that would account for Valentin's low tolerance for stress from any work-related cause. Instead, the ALJ simply gave "little weight" to all of these opinions. R. 35-36. While the ALJ concluded, with little explanation, that she was "account[ing] for the claimant's mental impairments by finding that she can perform simple work with occasional contact with others," R. 36, we cannot accept this conclusion given the faulty premise that accompanies it: that the ALJ was entitled to give little weight to every psychiatric source regarding stress simply because the cause of the stress was not specified.

Accordingly, the case must be remanded to permit the ALJ to consider what is the appropriate finding as to the claimant's ability to tolerate stress, how that finding impacts her RFC, and what jobs would be available based on that RFC. While we are not requiring the ALJ to do so, we note that an ALJ is permitted to recontact medical sources to request clarification or additional information regarding their opinions. See 20 C.F.R. § 404.1520b(b)(2); accord Nasci v. Colvin, 2017 WL 902135, at *9-10 (N.D.N.Y. Mar. 7, 2017) (remanding where issue of stress was not adequately addressed in physicians' assessments).

B. Valentin's Credibility

Finally, Valentin argues that the ALJ did not "properly evaluate" her credibility. Pl.

Mem. at 28. In the Second Circuit,

> When determining a claimant's RFC, the ALJ is required to take the claimant's reports of . . . limitations into account, 20 C.F.R. § 416.929; see McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980), but is not required to accept the claimant's subjective complaints without question; [she] may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record. Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).

Genier, 606 F.3d at 49. To evaluate a claimant's assertion of a limitation, the ALJ must engage

in a two-step process:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. [Id. § 404.1529(a)]. The ALJ must consider "[s]tatements [the claimant] or others make about [her] impairment(s), [her] restrictions, [her] daily activities, [her] efforts to work, or any other relevant statements [she] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings." 20 C.F.R. § 404.1512(b)(3); see also 20 C.F.R. § 404.1529(a); S.S.R. 96-7p.

Id. (citations omitted) (some alterations in original) (citations to version of 20 C.F.R. § 404.1529

effective as of May 27, 2010).[17]

Plaintiff's argument on this point is that the ALJ's credibility findings match the findings

used by the ALJ to reject plaintiff's treating sources, Pl. Mem at 29 — findings that we have

already concluded are supported by substantial evidence, except as to the issue of stress

described above. Thus this challenge by the claimant fails.

---

[17] The version of 20 C.F.R. § 404.1529 effective as of March 27, 2017, uses different language to describe a mostly identical form of analysis. See id. § 404.1529(c).

IV. CONCLUSION

For the above reasons, Valentin's motion (Docket # 15) is granted and the Commissioner's motion (Docket # 17) is denied. The case is remanded to the Commissioner for further proceedings consistent with this Opinion. The Clerk is requested to enter judgment and to close this case.

SO ORDERED.

Dated: New York, New York
       September 6, 2017

GABRIEL W. GORENSTEIN
United States Magistrate Judge